907 So.2d 192 (2005)
STATE of Louisiana, Appellee
v.
Kenneth SMITH, Appellant.
No. 39,698-KA.
Court of Appeal of Louisiana, Second Circuit.
June 29, 2005.
*193 Jack Wright, Jr., Monroe, for Appellant.
William R. Coenen, Jr., District Attorney, Johnny R. Boothe, Assistant District Attorney, for Appellee.
Before WILLIAMS, STEWART and PEATROSS, JJ.
WILLIAMS, J.
The defendant, Kenneth Smith, was charged by bill of information with aggravated battery for intentionally spraying Charles Yates with chemicals from a crop duster plane, a violation of LSA-R.S. 14:34.[1] After a bench trial, the defendant was found guilty as charged. The defendant filed a motion for new trial, which was denied by the trial court. Subsequently, the defendant was sentenced to serve five years at hard labor. The sentence was suspended and the defendant was placed on supervised probation for *194 five years. As a special condition of his probation, the defendant was ordered to pay a $2,500 fine and costs, and not to have any contact with the victim or the victim's wife. The defendant now appeals. For the following reasons, we affirm the defendant's conviction and sentence.

FACTS
On September 6, 2001, the defendant, an aerial applicator, was defoliating the cotton field adjacent to the Yates' property using the chemicals Dropp, DEF and Accelerate. The victim, Charles Yates, testified that he and his wife were visiting friends about "a half a mile away" from their house when he heard the airplane. He stated that they decided to return home to move their vehicles "to make sure they didn't get poison on them." He described the defendant's flight path as a "squeeze pattern" which started on the outside of the field and worked toward the center. Yates testified that the defendant had completed the east and west sides of the field and was working on the inside portion when he and his wife arrived home.
Yates testified that his wife warned him the defendant would "get him" immediately before the defendant flew directly above him and sprayed him. Yates testified that he could see the defendant's face at the time of the offense. Yates believed that the defendant intentionally sprayed him because the defendant dipped over a nearby power line, sprayed Yates and then pulled up over his home. Mrs. Yates testified that her husband was "directly sprayed." She stated that she "could just see all the stuff dripping down on [Yates] and he began to cough and spit." She further stated that the spray looked like "a heavy mist" and that it moved with the wind.
The defense argued at trial that if the chemicals made contact with Yates, then it was as a result of drift. The defendant testified that he did not intentionally spray Yates. He said that he used a drift retardant while defoliating the field. He stated that when applying defoliants, he flies low to the ground. At first, he testified that the wind had been blowing "out of the southwest at very little" speed. Later, he testified that he "had no way of knowing which way the wind was blowing on the north end of [the] field" where Yates had been. He testified that he returned to the field days after the incident and saw that "there was a green strip" in the cotton field adjacent to the Yates' property. However, he could not explain how the strip would not have been defoliated if drift had occurred. Instead, he agreed that "nothing drifted on the property."
Yates testified that immediately after the spraying his skin began stinging, he had a headache and he became nauseous. Mrs. Yates stated that "it was hard for him to breathe" and "he began to get very disoriented." Yates went to the Franklin Medical Center, but he could not recall how he got there or what happened. Although he was released the same day, he returned with nausea and a headache two days later. Michelle Lackovic, an employee of the Louisiana Department of Health and Hospitals, Office of Public Health, testified that common symptoms of exposure to Dropp, DEF and Accelerate include nausea, headache, dizziness and skin irritation. She stated that a "very large dose" could kill a person.
Yates filed a complaint with Jay Godfrey, an inspector of the Louisiana Department of Agriculture and Forestry. Godfrey took samples from the Yates' home, a stationary airplane and surrounding plants. He instructed Mrs. Yates to gather samples from the shirt Yates had been wearing and the vehicles. The samples taken by Godfrey and Mrs. Yates tested *195 positive for Dropp and DEF. Godfrey concluded in his report that because of the close proximity between the cotton field and the Yates' property, "a drift occurred from the application" made by the defendant. However, he later testified that based on the samples, he could not differentiate between a direct application and a drift.
At trial, the state offered evidence of a possible other crime for which the defendant was never charged or prosecuted. Yates testified that one night between midnight and 3:00 a.m. in July 2001, he saw the defendant at the airport where Yates stored his plane. The next day Yates had to make an emergency landing after the plane began shaking. Yates and Eric Young, an aircraft mechanic, repaired the plane and found material that "looked like sugar," "felt like sugar" and "tasted like sugar" in the sump screen in the bottom of the engine. Yates testified that to be in the sump screen, the sugar must have been "put in the engine oil receptacle where you put the oil in the engine."
Two witnesses testified that they had heard the defendant threaten Yates in the past. Floyd Waller testified that the defendant told him in 2000 "that any time he seen [sic] [Yates] in the air that he was going to try his best to take him down." Ronnie Cassels, Jr. testified that he heard the defendant make the same threat against Yates. Waller stated that he had heard those types of comments from the defendant on multiple occasions and that the defendant once asked him to sabotage the fuel cells in the wings of Yates' plane. According to Cassels, the defendant stated that he "would like to get somebody to do something to [Yates'] plane ... to mess with it." Waller had a prior conviction for attempted distribution of marijuana, and Cassels was previously convicted of "stealing," second degree battery and simple burglary.
The defendant waived his right to a jury trial. The parties entered into a joint stipulation that if called to testify, Dr. Robert Beine, a state chemist, and Amy Hernandez, an analyst, would state that the samples taken by Godfrey showed the presence of components found in DEF and Dropp. They also stipulated that, if called to testify, Scott McKee, general manager of A & L Analytical Laboratories, Inc., would state that a component of DEF was found on Yates' shirt. However, they further stipulated all three would testify that "[f]urther analysis would be required to provide a quantitative result and no such analysis was performed."
The defense called Dr. John Yager, a plant pathologist, who attempted to testify with regard to quantitative results that he calculated from data in the state report and to opine that the results indicated that there was no direct application. The state objected to his testimony based on the joint stipulation, arguing that the state lab results required further testing for quantitative analysis and that such testing had not been performed. The trial court sustained the objection, stating that based on the stipulation, Dr. Yager's testimony was inadmissible because the parties agreed that more testing, and not computations, was necessary to determine the quantities of the chemicals.
The defendant was found guilty of aggravated battery. He filed a motion for new trial, which was denied by the trial court. The defendant was then sentenced to serve five years at hard labor. His sentence was suspended and he was placed on supervised probation for five years. As a condition of his probation, the defendant was fined $2,500 and court costs and ordered to refrain from any contact with the Yates. The defendant appeals.

*196 DISCUSSION

Sufficiency of the Evidence
By this assignment of error, the defendant contends the trial court erred in accepting Yates' testimony that a direct application of the chemicals was made because the "totality of the evidence" did not support Yates' testimony. The defendant argues that Yates "did not get sprayed, and the chemicals never even got close enough to him for him to smell what was being sprayed." Alternatively, he argues that if Yates was sprayed with chemicals, then the state failed to prove that the spraying was an intentional act and not the result of drift. He states that Waller and Cassels, who were ex-convicts, testified that they heard the defendant's threats against Yates, but they did not inform law enforcement. He points out that there is no one to corroborate the Yates' account of a direct application; that Yates had problems remembering on the stand; and that Yates' prior statements of the occurrence of drift contradicted his testimony of a direct application. The defendant argues that neither Godfrey nor Lackovic could specify whether Yates had been directly sprayed. He also argues that he used a drift retardant and that the strip of the cotton field that was not defoliated supports his testimony that he turned off his spray valve as he flew near the Yates' property. Finally, he states that Yates, a crop duster for almost forty years, told physicians that he had been sprayed with a pyrethroid which is odorless. He states that he was spraying "a defoliant which has a very distinctive smell ... akin to rotten onions."
The state contends it proved each element of the crime of aggravated battery beyond a reasonable doubt. First, the state argues that it proved that the defendant intentionally used force or violence upon Yates through the eyewitness testimony of the Yates. The state argues that "the evidence of chemicals left at the scene" and the strip of land that was not defoliated prove the spray was not drift. It argues that the medical evidence established that Yates suffered "injuries consistent with exposure to the chemicals sprayed" by the defendant. The state alleges that the testimony of Waller and Cassels proved that the defendant had made threats against the victim. Secondly, the state argues that it proved the force or violence was committed with a dangerous weapon, namely the chemicals. It also states that the chemicals were used in a manner calculated to cause death or great bodily harm because Yates suffered harmful side effects and Lackovic testified that the chemicals could cause death or great bodily harm.
Here, the defendant actually challenges the sufficiency of the evidence to support his conviction. Although the record reflects that the defendant did not file a motion for post-verdict judgment of acquittal pursuant to LSA-C.Cr.P. art. 821, this court will consider the sufficiency arguments advanced by the defendant in the absence of such a motion. State v. Henson, 38,820 (La.App. 2d Cir.9/22/04), 882 So.2d 670.
When issues are raised on appeal both with regard to the sufficiency of the evidence and with regard to one or more trial errors, the reviewing court must first determine the sufficiency of the evidence. The reason for reviewing the sufficiency of the evidence first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could *197 not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The Jackson v. Virginia, supra, standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App. 2d Cir.9/25/98), 719 So.2d 610, writ denied, 1998-2723 (La.2/5/99), 737 So.2d 747.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. LSA-Const. art. V, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a judge's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App. 2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, and writ denied, XXXX-XXXX (La.6/26/98), 719 So.2d 1048.
Battery is the intentional use of force or violence upon the person of another; or the intentional administration of a poison or other noxious liquid or substance to another. LSA-R.S. 14:33. Aggravated battery is a battery committed with a dangerous weapon. LSA-R.S. 14:34. "Dangerous weapon" includes any gas, liquid or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm. LSA-R.S. 14:2(3). Aggravated battery is a crime of general intent, and thus, the criminal intent necessary to sustain a conviction is shown by the very doing of the criminal act. State v. Fuller, 414 So.2d 306 (La.1982); State v. Brown, XXXX-XXXX (La.App. 1st Cir.5/11/01), 808 So.2d 622. Thus, in order to convict this defendant of aggravated battery, the state must prove that: (1) the defendant intentionally administered a poison or other noxious liquid or substance to Yates by spraying him with the defoliants Dropp, DEF and Accelerate and (2) the defoliants were poisonous or noxious substances used in a manner likely or calculated to cause death or great bodily harm. LSA-R.S. 14:33, 14:34 and 14:2(3).
It is undisputed that: (1) the defendant was defoliating the cotton field next to the Yates' property, using Dropp, DEF and Accelerate; and (2) the chemical lab results indicated that Yates and the area surrounding him were sprayed with the same type of chemicals as those from the plane flown by the defendant. The remaining factual issue is whether Yates was intentionally sprayed or whether he was sprayed as a result of drift.
*198 At trial, the state presented the eyewitness testimony of both the victim and his wife to prove that the defendant intentionally sprayed the victim. They believed that the defendant intentionally sprayed Yates based on their personal observations. According to Yates, the defendant dipped his airplane over a nearby power line, sprayed him and pulled the airplane up over his home. Mrs. Yates testified that she warned her husband before the defendant flew over him. She testified that the defendant directly sprayed Yates with a heavy mist of the defoliants, causing Yates to immediately begin to cough and spit. In addition to the Yates' testimony, the state presented the testimony of Waller and Cassels with regard to the defendant's prior threats of harm against Yates.
The defendant testified that he did not intentionally spray Yates. He testified that he used a drift retardant while defoliating the field, but he could not 100% guarantee that there was no drift. The defendant could not explain how the green strip of cotton next to the Yates' property was not defoliated if drift had occurred; he eventually agreed that "nothing drifted on the [Yates'] property."
Mrs. Yates also testified that her husband became disoriented after being sprayed, which corroborated Yates' testimony that he could not remember the exact events that occurred after the spraying, including the statements he made to the doctors at the hospital that day. Yates filed a "complaint consent form" with the Department of Agriculture before going to the hospital. However, although he wrote on the form "that drift was a factor," he also wrote, "Applicator turned spray valve on, almost directly above [him and his property]."
Lackovic testified that the symptoms experienced by Yates immediately after being sprayedskin irritation, headache and nauseawere consistent with the common symptoms of exposure to Dropp, DEF and Accelerate. She further testified that a "very large dose" of the defoliants was possibly lethal.
The trial court, presented with two different versions of the facts, found that the testimony of the Yates was more credible than the testimony of the defendant. The trial court adopted Yates' testimony that the defendant flew over him and quickly sprayed him with the defoliants. The court found that this testimony was corroborated by the green strip of cotton. The trial court also found that the spraying of Yates was not an accident, but an intentional act, and that the state proved through the testimony presented that the defendant was guilty as charged.
As stated above, this court's authority to review questions of fact in this case does not extend to credibility determinations made by the trial court. LSA-Const. V, § 10(B); State v. Williams, supra. Thus, great deference is accorded to the trial court's decision to accept or reject the testimony of the witnesses in whole or in part. State v. Gilliam, supra.
After a thorough review of this record, we find that based on the evidence, viewed in a light most favorable to the prosecution, any rational trier of fact could have concluded beyond a reasonable doubt that the defendant was guilty of aggravated battery. The state proved by direct evidence through the eyewitness testimony of the Yates that: (1) the defendant intentionally administered a poison or noxious liquid or substance to Yates by directly spraying him with the defoliants and (2) the defoliants were poisonous or noxious substances used in a manner likely or calculated to cause death or great bodily harm. LSA-R.S. 14:33, 14:34 and 14:2(3). This assignment of error lacks merit.

*199 Exclusion of Expert Testimony

By this assignment of error, the defendant contends the trial court erred by failing to admit Dr. Yager's testimony at trial. The defendant argues that Dr. Yager should have been allowed to testify with regard to the extrapolations he made from the data in the state report. The defendant claims that if Dr. Yager's information had been presented, the "defense theory... would have sufficiently put reasonable doubt in the judge's mind, because of the extreme difference between" the amount of chemicals loaded in the plane for defoliation and the amount of chemicals detected in the collected samples and Yates' shirt. He argues that the state's objection to Dr. Yager's testimony was based on the out of courtroom statements of state experts that further analysis was required to quantify the amount of chemicals, and that such statements were hearsay. He further argues that he was denied "his fundamental right to present a defense because the trial court excluded [his] expert testimony based on the hearsay objections of the district attorney."
The state contends the exclusion of Dr. Yager's testimony based on the stipulation was not an abuse of the trial court's discretion and was not prejudicial to the defendant. The state argues that based on the stipulation, the named witnesses would only testify that the lab results indicated a presence of the components of DEF and Dropp. It argues that the stipulation "specifically states" that "[f]urther analysis would be required to provide a quantitative result and no such analysis was performed." The state further argues that because Dr. Yager did not perform further testing, the trial court correctly excluded his testimony of his quantitative analysis based on calculations from the lab results presented by the state.
A stipulation has the effect of binding all parties and the court. A trial court is bound to render judgment in accordance with the stipulations between the parties where the stipulations are not in derogation of the law. Such agreements are the law of the case. Becht v. Morgan Building & Spas, Inc., 2002-2047 (La.4/23/03), 843 So.2d 1109; R.J. D'Hemecourt Petroleum, Inc. v. McNamara, 444 So.2d 600 (La.1983).
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. A bill of exceptions to rulings or orders is unnecessary. LSA-C.Cr.P. art. 841(A). There is no "magic-word" formula necessary for remarks to constitute an objection. State v. Shoemaker, 500 So.2d 385 (La.1987). It is sufficient that a party, at the time of the ruling, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, together with the grounds therefor. LSA-C.Cr.P. art. 841(A); State v. Shoemaker, supra.
The record shows that the defendant failed to contemporaneously object to the trial court's ruling that Dr. Yager could not testify with regard to the quantity of chemicals based upon the joint stipulation. Before the trial court ruled, the defense counsel argued that Dr. Yager should be allowed to testify. He specifically asked, "[I]f we do have a quantity listed why can't he extrapolate from that?" He also requested that Dr. Yager be allowed to respond to the state's objection. However, after the ruling, the defense counsel only stated, "All right. So the State [sic] can't use it for that purpose so we can't use it for [this] purpose so it X's  it kind of X's each other out." That post-ruling statement is an agreement with the court's ruling rather than an objection to it.
*200 Where the defense counsel acquiesces when the court sustains a state's objection to the examination of a witness, that objection is waived. Thus, we find that the failure of the defendant to make a contemporaneous objection to the trial court's ruling constitutes a waiver of the objection to the exclusion of Dr. Yager's testimony and prevents the defendant from raising the error on appeal. State v. Huizar, 414 So.2d 741 (La.1982); State v. Williams, 26,716 (La.App. 2d Cir.5/10/95), 658 So.2d 703, writ denied, 95-2175 (La.2/2/96), 666 So.2d 1091.
We note that the defendant also presented Dr. Yager's findings in a motion for new trial. However, the trial court denied the motion for lack of new evidence. Moreover, there is no showing that Dr. Yager's testimony and his extrapolations from data already in evidence would have had any effect on the judgment, as the trial court found that the state proved its case through the testimony presented. Consequently, this assignment of error lacks merit.

CONCLUSION
For the foregoing reasons, the defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] The defendant was also charged with aggravated assault, a violation of LSA-R.S. 14:37. He was found not guilty of this offense.